IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1369

Filed: 21 June 2016

Wake County, No. 14 CVS 12648

STELLA ANDERSON, PAM WILLIAMSON, MARIANNE CLAWSON, ALAINA DOYLE, LAUREN LARUE JOYNER, IAN O'KEEFE, AND DAVID SABBAGH, Petitioners

v.

THE NORTH CAROLINA STATE BOARD OF ELECTIONS, Respondent

Appeal by respondent from order entered 13 October 2014 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 12 August 2015.

> *Bailey & Dixon, LLP, by Sabra J. Faires and William R. Gilkeson, Jr., for petitioner-appellees.*

> *Attorney General Roy Cooper, by Special Deputy Attorney General Katherine A. Murphy, for respondent-appellant.*

CALABRIA, Judge.

Respondent North Carolina State Board of Elections ("the Board") appeals from the superior court's order requiring it to adopt an early voting plan in Watauga County that included at least one site on Appalachian State University's campus during the 2014 general election. Because we hold that this appeal is moot, it must be dismissed.

## I. Background

Pursuant to our General Statutes, registered voters in North Carolina may, as an alternative to voting in person at their assigned precincts on Election Day, vote by mail-in absentee ballot. N.C. Gen. Stat. §§ 163-226, -227.2 (2015). Registered voters may also cast ballots through a procedure called "one-stop absentee voting," which is also known as "early voting." *Id.* § 163-227.2 (2015).

From 2006 until its 2013 municipal election, Watauga County elections included an early voting and an Election-Day voting site in Boone on the Appalachian State University campus ("ASU"). Subsequently, the Watauga County Board of Elections ("WCBOE") made numerous changes and departed from the customary voting sites. Specifically, the early voting plan for the 2014 primary did not include any Boone site other than the required site at the WCBOE office and four sites located in rural parts of Watauga County

On 23 July 2014, the WCBOE met to adopt an early voting plan. **(R. p. 1112)** The three-member board submitted two early voting plans for the 2014 general election. One plan included an early voting site on ASU campus ("minority plan") and the other plan, ("the majority plan") had five sites but did not include an early voting site on ASU's campus. Although the WCBOE voted on the competing proposals, they did not reach a unanimous agreement on an early voting plan for Watauga County.

- 2 -

N.C. Gen. Stat. § 163-227.2(g) provides that

> [i]f a county board of elections . . . has been unable to reach unanimity in favor of a Plan, a member or members of that county board of elections may petition the State Board of Elections to adopt a plan for it. If petitioned, the State Board may also receive and consider alternative petitions from another member or members of that county board. The State Board of Elections may adopt a Plan for that county. The State Board, in that plan, shall take into consideration factors including geographic, demographic, and partisan interests of that county.

N.C. Gen. Stat. § 163-227.2(g) (2015). At the time of the 2014 general election, subsection 163-227.2(g) further provided that the Board could make available a plan that did not offer early voting at the county board of elections office, but "only if the Plan include[d] at least one site reasonably proximate to the county board of elections office and the . . . Board [found] that the sites in the Plan as a whole provide[d] adequate coverage of the county's electorate." *Id.* § 163-227.2(g) (2014).

Since the WCBOE members were unable to adopt a unanimous early voting plan, they petitioned the Board to adopt a plan for Watauga County pursuant to subsection 163-227.2(g). As a result, the competing proposals for the minority and majority plans were submitted for the Board's consideration. After the Board considered proposals at a 21 August 2014 hearing, it adopted the WCBOE's majority plan without significant changes. On 29 August 2014, the Board memorialized its decision in a form letter addressed to the WCBOE's Director.

On 19 September 2014, seven registered voters in Watauga County ("Petitioners") filed a Petition for Judicial Review in Wake County Superior Court. The petition requested that the superior court determine whether the Board abused its discretion by adopting the majority plan for Watauga County, and it was filed pursuant to N.C. Gen. Stat. 163-22(l), which provides:

> Notwithstanding any other provision of law, in order to obtain judicial review of any decision of the State Board of Elections rendered in the performance of its duties or in the exercise of its powers under this Chapter, the person seeking review must file his petition in the Superior Court of Wake County.

N.C. Gen. Stat. § 163-22(l) (2015). Petitioners alleged that the Board made no findings to explain how it took the geographic, demographic, and partisan interests of Watauga County into consideration. They also alleged that the Board violated Article I, Section 19 and Article VI, Section I of the North Carolina Constitution and the 14th and 26th Amendments to the United States Constitution by erecting barriers for voters aged 18 to 25. Based on these allegations, petitioners asked the court to remand the majority plan to the Board to enter findings and explain its bases for adopting it.

In response, the Board filed a motion to dismiss the petition on seven enumerated grounds, the majority of which challenged the trial court's subject matter jurisdiction to hear and rule on the petition. According to the Board, the petition was improperly brought because it did not seek judicial review of either a "contested case"

brought under Chapter 150B of North Carolina's General Statutes or a decision of the Board "made in its quasi-judicial capacity under Chapter 163 of the General Statutes." Rather, the Board contended, the petition impermissibly sought review of the Board's decision, which was made pursuant to subsection 163-227.2(g) and "in its supervisory capacity over the [WCBOE]." After conducting a hearing on the Board's motion, the superior court entered an order on 13 October 2014. The order concluded that "[u]nder the unique circumstances of this case, [the Board's] early voting plan for [Watauga County was] subject to review by the Wake County Superior Court under [subsection] 163-22(l)." After reviewing the entire record before it, the superior court could find "no other intent from [the WCBOE's majority plan] other than to discourage student voting," and as a result, the court concluded that the plan "r[ose] to the level of a constitutional violation of [students'] right to vote." The superior court's order also denied the Board's motion to dismiss in its entirety and remanded the case for the Board to adopt an early voting plan for Watauga County for the 2014 November general election that included at least one voting site on the ASU campus. The Board appeals.

## II. Analysis

### A. Mootness and the Generally Applicable Law

Since the 2014 election is over and petitioners were granted the relief they sought, we must address whether the issues presented by this appeal are moot.

"A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Roberts v. Madison Cnty. Realtors Ass'n,* 344 N.C. 394, 398-99, 474 S.E.2d 783, 787 (1996) (citation omitted). For well over a century, our state courts and the federal courts have largely refused to address questions deemed moot. *See, e.g., Crawley v. Woodfin,* 78 N.C. 4, 6 (1878); *Mills v. Green,* 159 U.S. 651, 653, 40 L. Ed. 293, 293-94 (1895). While the mootness doctrine has been formulated in different ways, it must be understood as a core concept of justiciability, a general term which refers to whether a legal controversy is "appropriate or suitable" for judicial adjudication. *Black's Law Dictionary* 696 (9th ed. 2009); *see also Sunamerica Financial Corp. v. Bonham*, 328 N.C. 254, 257, 400 S.E.2d 435, 437 (1991) ("A justiciable issue has been defined as an issue that is 'real and present as opposed to imagined or fanciful.' " (quoting *K & K Dev. Corp. v. Columbia Banking Fed. Sav. & Loan*, 96 N.C. App. 474, 479, 386 S.E.2d 226, 229 (1989))) (citations omitted). However, whether a moot case is appropriate for judicial disposition may depend largely upon the tribunal that confronts it.

In the federal context, mootness was generally applied as though it were a prudential or discretionary doctrine until the mid-twentieth century. *Honig v. Doe*, 484 U.S. 305, 330, 608, 98 L. Ed. 2d 686, 711 (1988) (Rehnquist, J. concurring) ("[I]t seems very doubtful that the earliest case I have found discussing mootness, *Mills v. Green*, . . . was premised on constitutional constraints[.]"). However, in 1964, The

United States Supreme Court recognized mootness as a constitutional limitation on the jurisdiction of federal courts, which pursuant to Article III, Section 2 of the United States Constitution may decide only actual, ongoing cases and controversies. *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3, 11 L. Ed. 2d 347, 351 n.3 (1964) ("Our lack of jurisdiction to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy."). The mootness doctrine is also rooted in the prohibition against advisory opinions. *North Carolina v. Rice*, 404 U.S. 244, 246, 30 L. Ed. 2d 413, 415 (1971). For these reasons, "Article III denies federal courts the power 'to decide questions that cannot affect the rights of litigants in the case before them,' " while confining them "to resolving 'real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 108 L. Ed. 2d 400, 411 (1990) (quoting *Rice*, 404 U.S. at 246, 30 L. Ed. 2d at 415). All told, the constitutional jurisdictional underpinnings of mootness are now well established,[1] *e.g.*, *Honig*, 484 U.S. at 317-18,

---

[1] We note that courts and treatises have raised significant questions about the constitutional model of mootness in federal courts. Judges and scholars alike have argued that if the mootness bar was truly jurisdictional in nature, courts would have no authority to hear moot cases, even where prudential factors favored doing so. *See, e.g.*, *Honig*, 484 U.S. at 330, 98 L. Ed. 2d at 711 (1988) (Rehnquist, J. concurring) ("If our mootness doctrine were forced upon us by the case or controversy requirement of Art. III itself, we would have no more power to decide lawsuits which are 'moot' but which also raise questions which are capable of repetition but evading review than we would to decide cases which are 'moot' but raise no such questions."); 13B Charles Alan Wright, Arthur R. Miller &

98 L. Ed. 2d at 703, and the doctrine presents issues of justiciability at all stages of judicial proceedings. *Steffel v. Thompson*, 415 U.S. 452, 459 n.10, 39 L. Ed. 2d 505, 515 n.10 (1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").

By contrast, in state courts "[t]he exclusion of moot questions . . . represents a form of judicial restraint." *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978). This principle of restraint does not implicate jurisdiction but rather it is partially grounded in the notion that " '[j]udicial resources should be focused on problems which are real and present rather than dissipated . . ., hypothetical[,] or remote questions[.]' " *Crumpler v. Thornburg*, 92 N.C. App. 719, 722, 375 S.E.2d 708, 710 (1989) (citation omitted). In particular, "courts will not entertain or proceed with a cause merely to determine abstract propositions of law." *In re Peoples*, 296 N.C. at 147, 250 S.E.2d at 912. Our state-court mootness doctrine is also justified by the notion that a judicial tribunal's "inherent function . . . is to adjudicate genuine controversies between antagonistic litigants with respect to their rights, status, or other legal relations." *Angell v. City of Raleigh*, 267 N.C. 387, 389-90, 148 S.E.2d 233,

---

Edward H. Cooper, *Federal Practice & Procedure* § 3533.1 (3d ed. 1998) ("There is reason to wonder whether much reliance should be placed on constitutional concepts of mootness when . . . all ordinary needs can be met by the discretionary doctrines. The Article III approach is nonetheless firmly entrenched, and must be reckoned the major foundation of current doctrine.").

235 (1966) (citation and internal quotation marks omitted). Therefore, as a general rule, "[w]henever, during the course of litigation it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should be dismissed[.]" *In re Peoples*, 296 N.C. at 147, 250 S.E.2d at 912.

Despite the differences in its origins at the state and federal levels, the mootness doctrine's limits "are articulated almost identically in the federal courts and the courts of this State." *Thomas v. N.C. Dep't of Human Res.*, 124 N.C. App. 698, 705, 478 S.E.2d 816, 820 (1996) (citation omitted). Thus, federal treatment of the mootness doctrine may be instructive to state courts when they are confronted with moot questions in a variety of contexts.

Here, the trial court's order required the Board to adopt a plan that included the location of an early voting site on ASU's campus during the 2014 election. Since the petitioners were granted the relief they sought, and the 2014 election has come and gone, all parties agree that this case is technically moot. In addition, neither party contends that the substantive legal issue in this case—whether the WCBOE's majority plan infringed the constitutional rights of students—is still alive. The Board, however, asserts that an important procedural question has survived on appeal. Specifically, the Board argues, and asks this Court to decide, that the superior court does not have jurisdiction under subsection 163-22(l) to conduct a judicial review of a

"decision made by [the] Board in the exercise of its supervisory capacity over county boards of elections."

B. Capable of Repetition, Yet Evading Review Exception to Mootness

Although "the general rule is that an appeal presenting a question which has become moot will be dismissed[,]" *id.* (citation and internal quotation marks omitted), courts may consider moot cases falling within one of several limited exceptions to the doctrine. *See In re Investigation Into the Injury of Brooks,* 143 N.C. App. 601, 604, 548 S.E.2d 748, 751 (2001) (recognizing "at least five exceptions to the general rule that moot cases should be dismissed"). The Board contends that the procedural issue it has raised under subsection 163-22(l) falls within two established exceptions to mootness. The Board first argues that we are permitted to address the merits of this otherwise moot appeal because the case is " 'capable of repetition, yet evading review.' "[2] *Shell Island Homeowners Ass'n, Inc. v. Tomlinson*, 134 N.C. App. 286, 292,

---

[2] We note that the United States Supreme Court has repeatedly described mootness as " 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' " *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22, 137 L. Ed. 2d 170, 193 n.22 (1997) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 63 L. Ed. 2d 479, 491 (1980) (citation omitted)). However, the Court has also noted that this description of mootness "is not comprehensive." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190, 145 L. Ed. 2d 610, 633 (2000). Thus, in applying well established exceptions to the mootness doctrine, courts should not confuse mootness with standing: The "[s]tanding doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often . . . for years. *Id.* at 191, 145 L. Ed. 2d at 634; *see also Renne v. Geary*, 501 U.S. 312, 320, 111 S. Ct. 2331, 2338, 115 L. Ed. 2d 288, 301 (1991) ("[T]he mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced.") (internal citation omitted).

517 S.E.2d 401, 405 (1999); *see also Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006) ("A case is not moot . . . if a party can demonstrate that the apparent absence of a live dispute is merely a temporary abeyance of a harm that is 'capable of repetition, yet evading review.' " (quoting *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003)). We disagree.

The " 'capable of repetition, yet evading review' " exception applies when: " '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.' " *130 of Chatham, LLC v. Rutherford Electric Membership Corp.*, __ N.C. App. __, __, 771 S.E.2d 920, 926 (2015) (citation omitted). Since the parties agree that this case satisfies the first prong, we see no reason to address it: the majority of election cases are unique in that the controversy's endpoint, the election itself, is firmly established and beyond the control of litigants. As to the second prong, the United States Supreme Court has specified "that a mere physical or theoretical possibility [is not] sufficient to satisfy the test . . . . Rather, . . . there must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining

party."[3] *Murphy v. Hunt*, 455 U.S. 478, 482, 71 L. Ed. 2d 353, 357 (1982) (citation omitted). The Court has further stated that the capable-of-repetition exception "applies only in exceptional situations." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 75 L. Ed. 2d 675, 689 (1983). For the reasons that follow, we cannot discern a reasonable expectation, much less a demonstrated probability, that the same complaining party will again be subject to the same action.

While the term "same action" may not hold an inflexible meaning,[4] it is clear that the capable-of-repetition exception requires specificity between a case deemed moot and one that may arise in the future. *See, e.g.*, *Sullivan v. Wake Cnty. Bd. of Educ.*, 165 N.C. App. 482, 488, 598 S.E.2d 634, 638 (2004) ("There is no reasonable expectation that the same complaining party[—parents who challenged their son's

---

[3] The United States Supreme Court has determined that a "reasonable expectation may be satisfied by something less than a "demonstrated probability." *Honig*, 484 U.S. at 319 n.6, 98 L. Ed. 2d at 704 n.6 (citing "numerous cases" where the Court "found controversies capable of repetition based on expectations that, while reasonable, were hardly demonstrably probable"). However, in *Honig*, Justice Scalia argued that the majority's reasoning on this point was circular, and he insisted that for there to be a "reasonable expectation" that a party will be subjected to the same action again, the relevant event must be a "demonstrated probability." *Id.* at 334, 108 S. Ct. 592, 610, 98 L. Ed. 2d at 714 (Scalia, J, dissenting) ("It is obvious that in saying 'a reasonable expectation or a demonstrated probability' we have used the conjunction in one of the latter, or nondisjunctive, senses. Otherwise (and according to the Court's exegesis), we would have been saying that a controversy is sufficiently likely to recur if either a certain degree of probability exists or a higher degree of probability exists."). It appears that North Carolina courts have not addressed this issue (or even included the "demonstrated probability" language in the capable-of-repetition analysis). In any event, here, the Board has failed to meet either threshold.

[4] We note that this Court recently held the capable-of-repetition exception "does not require [an examination] of the exact same action occurring in the future[;]" rather, it allows consideration of "similarly situated parties[.]" *Cumberland Cnty. Hosp. Sys., Inc. v. N.C. Dep't of Health & Human Servs.*, __ N.C. App. __, __, 776 S.E.2d 329, 335 (2015). However, the holding in *Cumberland Cnty.* has no bearing on our analysis in this case. As explained below, the Board completely reinvents the "same action" requirement of the exception, and it cannot be considered the "same complaining party."

elementary school assignment—]would be subject to the *same factors* used by the school board in making its assignment/transfer determinations for *any school year beyond* 2002-2003.") (emphasis added); *Boney Publishers, Inc. v. Burlington City Council*, 151 N.C. App. 651, 654, 566 S.E.2d 701, 704 (2002) (newspaper publisher's action against city council for alleged violations of public records laws was technically moot, but there was "a reasonable likelihood that [the council], in considering the acquisition of other property for municipal purposes, could *repeat the conduct* which is *at issue here*, subjecting [the publisher] to the same action") (emphasis added); *Crumpler*, 92 N.C. App. at 724, 375 S.E.2d at 712 (case not capable of repetition where it had "been more than two years since plaintiff filed [his] suit and he ha[d] yet to be arrested or refused a permit for a similar demonstration"). It is equally clear that the term ordinarily refers to a decision, practice, or other harm that was challenged and litigated by a plaintiff, or a "complaining party." Although North Carolina courts have not squarely addressed this issue, the United States Supreme Court has specified that the capable-of-repetition doctrine "applies . . . generally only where the *named plaintiff* can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109, 75 L. Ed. 2d 689 (emphasis added). Thus, as a general rule, the "same action" must be understood as referring to the conduct that gave rise to the plaintiff's (or complainant's) claims in the relevant proceeding or lawsuit. *See Lux v. Judd*, 651 F.3d 396, 401 (4th Cir. 2011) (concluding that

challenge of Virginia State Board of Elections decision brought by former congressional candidate and his supporters was " 'capable of repetition' " when " 'there [was] a reasonable expectation that the challenged provisions [would] be applied against the plaintiffs again during future election cycles' ") (citation omitted); *Shell Island Homeowners Ass'n*, 134 N.C. App. at 292, 517 S.E.2d at 405 ("Assuming *arguendo* that the claims are capable of repetition, there is no evidence to suggest that [the] plaintiff's grievances have evaded review.").

Despite these well-established principles, the Board attempts a clever "bait and switch" on appeal: it contends that the central issue is whether the superior court "has jurisdiction to hear what amounts to a collateral attack on a decision of the . . . Board to adopt an early voting plan for a county in which the county board of elections was not unanimous." Based on this characterization of the case, the Board argues that "absent a ruling from this Court clarifying the superior court's jurisdiction, it is reasonably likely that the . . . Board will again find itself in this same position, namely, forced to defend against a collateral challenge to an early voting plan that [it] has approved or adopted[.]" The Board's approach is inherently flawed, however, because it impermissibly recasts the nature of the parties' dispute. In making its arguments, the Board turns the capable-of-repetition exception on its head. Our review of the pertinent case law reveals that the exception is intended to allow plaintiffs to obtain a judgment or appellate review in cases where the two

prongs are met; it is not designed to protect defendants or respondents from future lawsuits. Accordingly, based on the facts of this case, the "same action" is not whether the Board might be forced to defend against its adoption of a future early voting plan, but whether future registered voters will challenge an early voting plan adopted by the Board as violative of the constitutional rights of voters aged 18 to 25.

We agree with petitioners that a series of speculative events must occur for a similar controversy, i.e., the "same action," to arise again: (1) a local board of elections must be unable to adopt a unanimous early voting plan; (2) the majority members of the local board must adopt a plan which allegedly discriminates against young voters and violates their state and federal constitutional rights; (3) the Board must review competing plans from the local board and adopt the majority plan without significant change; (4) and one or more voters must file a petition for judicial review of the Board's decision pursuant to subsection 163-22(l). Another factor weighing against the repetition of the same action is the ever-changing composition of the Board and local boards of election. *See* N.C. Gen. Stat. §§ 163-19 (2015) (providing four-year terms (and a maximum of two consecutive terms) for members of the Board); 163-30 (2015) (providing two-year terms for members of local boards).

In a rather tepid response to this line of reasoning, the Board asserts that the issue it "asks this Court to review is the purely procedural question of whether the superior court has jurisdiction to hear a petition for judicial review of the adoption of

an early voting plan, irrespective of the reasons underlying the challenge." The Board's position, as we understand it, is simply that it would like to know if its future adoptions of early voting plans for counties will be subject to judicial review under subsection 163-22(l). Indeed, at oral argument, the Board stated that it would like the "comfort" of knowing whether subsection 163-227.2(g) requires it to adjudicate the constitutional rights of voters when it adopts an early voting plan for a county. Yet as our Supreme Court has previously pointed out, it is not a proper function of courts " 'to give advisory opinions, or to answer moot questions, or to maintain a legal bureau for those who may chance to be interested, for the time being, in the pursuit of some academic matter.' " *Adams v. N.C. Dept. of Natural and Economic Res.*, 295 N.C. 683, 704, 249 S.E.2d 402, 414 (1978) (citation omitted). By seeking "clarification" and "comfort," the Board is surely asking us for advice we are not obliged to give. More to the point, just because the Board says the procedural issue it has identified may arise again does not make that issue the "same action" for purposes of analysis under the capable-of-repetition exception to mootness.

The second prong of the exception is also unsatisfied here because the Board— the respondent in this case—wrongly characterizes itself as the same "complaining party." *See Black's Law Dictionary* 323 (9th ed. 2009) (defining "complainant" as "[t]he party who brings a legal complaint against another; esp[ecially], the plaintiff in a court of equity or, more modernly, a civil suit"). Although situations may arise

where a defendant or respondent can be considered the complaining party for purposes of this exception to mootness, we are aware of no North Carolina appellate decisions that have adopted such an approach. As we have intimated above, the implicit rule in North Carolina is that the term "complaining party" invariably refers to plaintiffs who could be subjected to the complained of activity again in the future. *See, e.g.*, *Sullivan*, 165 N.C. App. at 488, 598 S.E.2d at 638 (analyzing whether the respondent school board would subject the petitioners' son to the same action again); *Boney Publishers, Inc.*, 151 N.C. App. at 654, 566 S.E.2d at 704 (analyzing whether the defendant might subject the plaintiff to the same action again); *Crumpler*, 92 N.C. App. at 724, 375 S.E.2d at 712 (same). Several federal circuit courts have explicitly recognized this rule. *See Sierra Club v. Glickman*, 156 F.3d 606, 620 (5th Cir. 1998) ("By its very terms, the exception is designed to protect plaintiffs; it is not designed to protect defendants from the possibility of future lawsuits[.]"); *Fischbach v. N.M. Activities Ass'n*, 38 F.3d 1159, 1161 (10th Cir. 1994) ("The mere fact that the [defendant] claims the action is not moot does not make [it] the complaining party for purposes of analysis under the exception to the mootness doctrine. The complaining parties in this action are the [plaintiffs], and it has been established that they will not be subjected to the actions of the [defendant] again."); *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985) ("The . . . [capable of repetition exception] usually is applied to situations involving governmental action where it is feared that the

challenged action will be repeated. The defending party being constant, the emphasis is on continuity of identity of the complaining party. When the litigation is between private parties, we must consider whether the anticipated future litigation will involve the same defending party as well as the same complaining party.").

Here, petitioners' allegations that the Board adopted an unconstitutional early voting plan gave rise to the original action; however, the superior court's order resolved the case to their satisfaction, and there is no reason to believe that they will be subjected to the same action in future elections. By contrast, on appeal, the Board complains that under petitioners' "view of the law, any disgruntled voter who is dissatisfied with the early voting plan adopted for his or her county may file a petition in the Superior Court of Wake County challenging the . . . Board's approval or adoption of an early voting plan for the county, as a means of changing a plan that is not to his or her liking." This contention assumes that the superior court would find that it had jurisdiction under subsection 163-22(l) in any conceivable scenario. Furthermore, at oral argument, the Board insisted that it was "extraordinary" for the superior court to rule on petitioners' constitutional claims based on such a "thin" record (i.e., no evidentiary hearing was held and the Board made no findings). The Board then declared that petitioners should have filed an "independent" action invoking the superior court's original jurisdiction. But when asked how the record would have differed in any material way had petitioners brought a declaratory

judgment action or a suit for injunctive relief, the Board had no viable answer. As such, the Board is simply positing a distinction without a difference, and it cannot be considered the complaining party for purposes of the capable-of-repetition exception to the mootness doctrine. In other words, the Board's argument is little more than a complaint about the *form* of future legal actions which may be filed against it. Even if we accepted the Board's view on the issues its appeal purportedly presents, the fact that petitioners could have obtained review of the Board's decision through other legal and procedural avenues suggests that *all* aspects of this case are moot.

In sum, since there is no reasonable expectation that petitioners (the complaining party in this case) will be subject to the same action again, the Board cannot demonstrate that this particular controversy will repeat itself. Accordingly, based on the record before us, we conclude that this case is not one that is capable of repetition, yet evading review.

C. Public Interest Exception to Mootness

The Board also argues that the public interest exception to mootness applies in this case. Once again, we disagree.

A court may consider a case that is technically moot if it "involves a matter of public interest, is of general importance, and deserves prompt resolution." *N.C. State Bar v. Randolph*, 325 N.C. 699, 701, 386 S.E.2d 185, 186 (1989). However, this is a very limited exception that our appellate courts have applied only in those cases

involving clear and significant issues of public interest. *See, e.g., Granville Cnty. Bd. of Comm'rs v. N.C. Hazardous Waste Mgmt. Comm'n*, 329 N.C. 615, 623, 407 S.E.2d 785, 790 (1991) ("Because the process of siting hazardous waste facilities involves the public interest and deserves prompt resolution in view of its general importance, we elect to address it."); *State v. Corkum*, 224 N.C. App. 129, 132, 735 S.E.2d 420, 423 (2012) (holding that an issue of structured sentencing under the Justice Reinvestment Act of 2011 required review because "all felons seeking confinement credit following revocation of post-release supervision will face similar time constraints when appealing a denial of confinement credit effectively preventing the issue regarding the trial judge's discretion from being resolved"); *In re Brooks*, 143 N.C. App. at 605-06, 548 S.E.2d at 751-52 (applying the public interest exception to police officers' challenge of a State Bureau of Investigation procedure for handling personnel files containing "highly personal information" and acknowledging that "the issues presented . . . could have implications reaching far beyond the law enforcement community").

Our review of the Board's arguments is animated by the following principles. First, North Carolina courts "do not issue anticipatory judgments resolving controversies that have not arisen." *Bland v. City of Wilmington*, 10 N.C. App. 163, 164, 178 S.E.2d 25, 26 (1970), *rev'd on other grounds*, 278 N.C. 657, 180 S.E.2d 813 (1971). Second, litigants are not permitted "to fish in judicial ponds for legal advice."

*Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 584, 347 S.E.2d 25, 29 (1986) (citation omitted).

We begin by noting that the arguments the parties make, and the words they use, before this Court matter. In the instant case, the Board requests that we provide "proper *guidance* . . . so that [the Board] can provide the appropriate procedure at its hearings on matters brought before it pursuant to [section] 163-227.2." (Emphasis added). The Board also insists that "[t]his appeal [should] *determine* whether the . . . Board is *required* to conduct . . . hearings [on non-unanimous early voting plans for counties] as quasi-judicial hearings." (First emphasis added). Such language suggests that the Board intends to "put [the requested opinion] on ice to be used if and when [the] occasion might arise." *Tryon v. Power Co.*, 222 N.C. 200, 204, 22 S.E.2d 450, 453 (1942). In essence, we have been asked to render a declaratory judgment, complete with practical advice, on how the Board must perform its duties pursuant to section 163-227.2. This we cannot do. Furthermore, deciding the issues raised by the Board on appeal would require us to issue an advisory opinion, something we are unwilling and unauthorized to give. *E.g.*, *In re Wright*, 137 N.C. App. 104, 111-12, 527 S.E.2d 70, 75 (2000) (" '[T]he courts have no jurisdiction to determine matters purely speculative, enter anticipatory judgments, . . . deal with theoretical problems, give advisory opinions, . . . provide for contingencies which may hereafter arise, or give abstract opinions.' " (omission in original) (quoting *Little v.*

*Wachovia Bank & Trust Co.*, 252 N.C. 229, 243, 113 S.E.2d 689, 700 (1960))). Although "guidance" is always useful in the election-law context, the Board's arguments fail to demonstrate why the procedural issues it raises deserve prompt resolution.

The Board also fails to explain how the particular judicial review that petitioners obtained implicates any greater public interest, nor do we believe that it does. Instead, the Board's "public interest" argument is focused on its own interests, to wit: it seeks advice on how to conduct hearings on early voting plans and what resources must be employed in that process. But self-serving contentions based upon a theoretical state of affairs cannot defeat the principle of judicial restraint that sustains our State's mootness doctrine. Simply put, the matter is not one of such "general importance" as to justify application of the public interest exception. *Beason v. N.C. Dep't of Sec'y of State*, 226 N.C. App. 233, 239, 741 S.E.2d 663, 667 (2013) (citation omitted).

### III. Conclusion

The 2014 election is over and the superior court's order granted petitioners the relief they sought. As a result, this appeal presents questions that are moot. Despite the Board's arguments to the contrary, there is no reasonable expectation that petitioners will be subjected to the same action again. The issues raised before the superior court, therefore, do not fall within the capable of repetition, yet evading

review exception to the mootness doctrine. In addition, since the Board asserts little more than self-serving interests on appeal, the issues it has presented to this Court are not of such public interest as to except this matter from its otherwise moot nature. Accordingly, we dismiss the Board's appeal.

DISMISSED.

Judge ELMORE concurs.

Judge DILLON dissents by separate opinion.

DILLON, Judge, dissenting.

I agree with the majority that this case is technically moot. The 2014 election is over. However, because I conclude that the issues raised are "capable of repetition, yet evading review," my vote is *not* to dismiss this appeal based on mootness. Accordingly, I respectfully dissent.

## I. Background

In August 2014, the State Board of Elections (the "Board") exercised its authority to implement a plan (the "2014 Plan") designating early voting sites in Watauga County for the 2014 general election. N.C. Gen. Stat. § 163-227.2 (2013). The 2014 Plan adopted by the Board included a number of voting sites throughout Watauga County, including one location within one mile of the Appalachian State University ("ASU") campus.

In September 2014, seven county residents filed a "Petition for Judicial Review" in Wake County Superior Court seeking an order to compel the Board to include a voting site *on* ASU's campus.

On 13 October 2014, ten days before early voting began, the superior court held a hearing on the petition and issued an order (the same day), concluding that the Plan – requiring would-be ASU students who wanted to vote early to travel one mile to cast the vote – constituted a "significant infringement of [ASU] student rights to vote and rises to the level of a constitutional violation of the right to vote[.]" Accordingly, the court compelled the Board to provide a site on ASU's campus.

On 16 October 2014, the Board filed its notice of appeal to our Court. However, by the time the record on appeal was settled and the appellate briefs had been filed, the 2014 general election was well over.

## II. Discussion

The issues pertaining to the 2014 Plan are technically moot; however, the issues involved are exactly the type which are "capable of repetition, yet evading review[.]" *See Reep v. Beck*, 360 N.C. 34, 40, 619 S.E.2d 497, 501 (2005) (recognizing the "capable of repetition, yet evading review" exception as one of the "longstanding exceptions to the mootness rule"). Accordingly, I conclude that the mootness doctrine does not apply.

The Watauga County Board of Election and the Board, which are statutorily empowered to choose the location of "one stop" early voting sites in Watauga County, are each controlled by the sitting Governor's political party.[5] N.C. Gen. Stat. § 163-227.2(g) (2015). In choosing the sites, these boards are afforded some discretion, so long as the decision is not violative of applicable state or federal laws or of the state and federal constitutions. Whatever decision is made on the site locations, certain

---

[5] Control by the Governor's party is not mandated, but occurs in practice. The State Board of Elections is set up to be controlled by the Governor's political party as its five members are appointed by the Governor and the Governor is allowed to have a majority come from his/her own party. N.C. Gen. Stat. § 163-19 (2015). The State Board, in turn, appoints each county board's three members, and is allowed to have a majority (two) of each county board to come from the Governor's political party. N.C. Gen. Stat. § 163-30 (2015)
.

voters will be required to travel farther than other voters in order to take advantage of early voting.

In 2012, the Democratic-controlled boards decided to locate an early voting site *on* ASU's campus, requiring voters who lived near ASU to travel to the campus to vote (or to a more remote location). The 2014 Plan adopted by the Republican-controlled boards, however, would have provided a site which was more convenient than the 2012 on-campus site for certain voters but less convenient for ASU students living on campus. To be sure, politics may have played some part in the decisions of both boards, but their decisions are nonetheless permissible *unless* violative of state or federal law or our state or federal constitutions. In the same way, our General Assembly has *some* discretion to consider politics in drawing our congressional and legislative districts, *see Hunt v. Cromartie*, 526 U.S. 541, 551, 119 S. Ct. 1545, 1551, 143 L. Ed.2d 731, 741 (1999), *see also Dickson v. Rucho*, ___ N.C. ___, ___, 781 S.E.2d 404, 437 (2015) (recognizing "partisan advantage" as a "legitimate governmental interest[]"), provided the maps do not violate controlling state or federal laws or our state or federal constitutions.

It is now 2016, and the Republicans are still in control of the Watauga County and State boards of elections. The United States Supreme Court has recognized that cases challenging election practices which may otherwise become moot due to an election being held should be nonetheless decided as the issues involved are likely to

3

recur in subsequent elections. *Morse v. Republican Party of Va.*, 517 U.S. 186, 235 n. 48, 116 S. Ct. 1186, 1214 fb. 48, 134 L. Ed.2d 347, 382 n. 48 (1996). Here, the election practice at issue is likely to recur in the 2016 general election. However, like in the present case, any appeal regarding the 2016 general election would most likely *not* be in a position to be resolved by our state appellate courts until well after the election has been held.

In conclusion, I believe the "election practice" issues are ripe for our consideration despite the fact that the 2014 election is over. There is another election just around the corner, and the Watauga County Board will again be faced with whether their plan must provide a voting site on ASU's campus. Accordingly, I believe we should resolve this issue and not dismiss the appeal merely because the 2014 election is over. [6]

---

[6] Also, even if the issues do not fit the criteria for being capable of repetition, yet evading review, I believe that the matter raised here involves substantial issues of public interest – issues involving the integrity of our election process – and, therefore, we should resolve the issues, notwithstanding the fact that the 2014 election is over. These issues include, for example, the scope of the authority of boards of elections to choose early voting sites, the standing of voters to seek judicial review of a decision by a board of elections regarding the location of early voting sites, and the proper procedure to challenge such decisions made by a board of elections.